**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATMEL CORPORATION,<br><br>    Plaintiff,<br><br>   v.<br><br>ST. PAUL FIRE & MARINE INSURANCE COMPANY,<br><br>    Defendant.<br>_____/ | No. C 04-04082 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: CGL AND UMBRELLA POLICIES** |

On March 17, 2006, the Court heard oral argument on defendant St. Paul's motion for partial summary judgment on Atmel's claim for coverage under the CGL and umbrella policies.[1] After careful consideration of the parties' papers and the arguments of counsel, the Court GRANTS St. Paul's motion.

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that

---

[1] On the same date, the Court also heard oral argument on St. Paul's motions for partial summary judgment concerning bad faith/punitive damages claims and concerning the applicability of the collateral source rule. Those motions have been resolved in separate orders. [Docket ## 542, 543]

there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

In its orders filed October 11, 2005 and February 21, 2006, the Court set forth the background facts to this lawsuit. The Court incorporates those facts herein.

St. Paul moves for partial summary judgment on Atmel's claim for coverage under the CGL and umbrella policies (collectively "CGL policies"). St. Paul contends that the *Seagate* action did not seek damages covered by the CGL policies because Atmel's chips did not cause "property damage" as that term is defined in the CGL policies and interpreted by case law. Further, St. Paul contends that even if there was "property damage," the "impaired property" exclusion contained in the CGL policies prevents coverage.

**A.     The *Seagate* Action**

Seagate sued Atmel on July 31, 2002, in Santa Clara Superior Court. FAC ¶ 7. Seagate pled claims for breach of contract, breach of warranty, indemnity, negligent misrepresentation, negligence, strict liability, unfair competition, and breach of the implied covenant of good faith and fair dealing. Goodman Decl. ¶ 4, Tab C (Runkel Depo. Ex. 32, ¶ 1). Seagate asserted that "Atmel's chips were defective, and they caused Seagate's disk drives to fail." *Id.* at ¶ 8. Seagate further alleged that it "had sold millions of disk drives to customers manufactured with Atmel's defective chips," and, as a result,

2

it "had to address customers' complaints and concerns by repairing or replacing defective disk drives." *Id.* at ¶¶ 10-11.

Although Atmel disputes that its chips were defective, Atmel's Opposition states, "[t]he alleged failure mechanism that was at the heart of Seagate's claims appeared to involve a confluence of factors (humidity, dwell time, and others) that caused a molecular bridge to begin to form in the Sumitomo mold compound between electrical leads on the Atmel chip. At some point in time, the molecules formed a continuous link between the leads and the chip short-circuited. Until that moment the chip and the disk drives worked." Atmel Opposition at 2-3.[2] It is undisputed that the failure of the Atmel chips did not cause any physical damage to the Seagate disk drives.

Seagate repaired the disk drives containing the allegedly defective chips in the following manner. The repair process began with the disk drive being inspected to determine if it had an Atmel chip. If the drive had an Atmel chip, the drive's printed circuit board assembly ("PCBA") was removed and sent to the PCBA rework area. Another PCBA was attached to the remainder of the drive, and the drive left the repair facility with a different PCBA than it had when it entered the facility. The Atmel chip was desoldered from the PCBA and a non-Atmel replacement chip was attached to it. After the replacement chip was attached, the PCBA was returned to "functional stock." *See generally id.* at Tab M (Clark Depo. at 241-47); Tab L, Ex. 561 at AC12344-46. Customers who returned drives to Seagate either

---

[2] A Seagate "Overview & Risk Assessment" of the "Atmel Phosphorous Issue," stated:

The failure occurs typically in the following manner:
1. Phosphorus must be present between the failing adjacent pins.
2. High humidity must be present.
3. Electro migration of silver/copper due to a bias voltage between the failing pins.
4. Idle time or constant dwell while running has accompanied each confirmed failure.
5. Some period of time is required to develop the failure.
6. Intermittent shorts or low resistance between adjacent pins is the failure mode.

Goodman Decl., Tab D (Magnuson Depo. Ex. 165 at AC11448). A "Failure Analysis" conducted by Atmel "[c]oncluded that copper is being corroded by P [phosphorus] and this mixture is causing the pin to pin short. For this to occur need P [phosphorus], moisture and corrosion." *Id.* at Tab E.

3

received a new drive or a refurbished drive with the Atmel chip replaced. *Id.* at Tab Q at AC12336-38. A significant percentage of the drives for which Atmel chips were removed and replaced had not failed. *See id.* at Tab S (Sterling Depo. at 292:19-23).

In April 2005, Atmel settled the *Seagate* action by agreeing to pay Seagate $5,900,000. Seagate's discovery responses from January 2005, shortly before the settlement of the *Seagate* action, stated that it was seeking damages for the following costs incurred "as a result of the incorporation of defective Atmel chips in its products" (Goodman Decl. ¶ 13, Tab L (Ex. 561 at AC12343)): (1) "the repair and replacement of drives containing defective Atmel chips" (*Id.* at AC12344); (2) "costs for the shipment of repaired drives to the customers that had returned the drives for repair" (*Id.* at AC12347); (3) screening drives for Atmel chips at customer locations at which the disks were installed (*Id.* at AC12348); (4) employee salary and travel expenses associated with investigation of the Atmel chip failures (*Id.* at AC12350-51); (5) maintenance of a "reserve fund to cover [Seagate's] potential liability to its customers as a result of problems arising from defective Atmel chips in Seagate drives" (*Id.* at AC12349); and (6) "accommodations" to Seagate customers in response to their complaints of drive failures. (*Id.* at AC12344).[3] Seagate's interrogatory responses stated that it "will not seek to recover damages for lost profits or injury to its goodwill with customers as a result of the Atmel Chip problem." (*Id.* at AC12352). In March 2005, Seagate supplemented its interrogatory responses and stated that it was not pursuing a claim for damages "based on customer complaints about the backlog on Seagate's repair capability as a result of the Atmel chip problem," (*Id.* at Tab O (Anderson Depo.. Ex. 545 at AC07885)), nor was it seeking any recovery for lost sales. (*Id.* at AC07888).

---

[3] According to Seagate's interrogatory response,

Many of the accommodations involved an agreement by Seagate to provide free of charge new and/or refurbished disk drives, without Atmel chips. For new drives provided to customers, Seagate lost revenue for those drives, at the price that otherwise would have been paid by the customer for those new drives at the time. Refurbished drives provided without charge to customers, in some cases as "buffer stock," were valued by Seagate generally in the range of $50 to $100, depending on the model drive provided. In some instances Seagate provided customers credit toward purchases of drives or discounts for drive purchases. . . . Customers are continuing to demand accommodations from Seagate as compensation for the Atmel problem. The total cost to Seagate of these accommodations to date exceeds $10 million.

*Id.* at AC12344.

4

**B. The CGL Policies**

The CGL policies provide:

**Bodily injury and property damage liability:** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury, property damage, or premises damage that:

- happens while this agreement is in effect; and
- is caused by an event.

Goodman Decl. ¶ 23, Tab V (Falvey Depo. Ex. 22 at ABD0005196). The CGL policies define "property damage" as follows:

*Property damage* means:

- physical damage to tangible property of others, including all resulting loss of use of that property, or
- loss of use of tangible property of others that isn't physically damaged.

For example:

*One of your employees accidentally causes a fire in your premises. The fire department responds and orders nearby businesses to close for safety reasons while it fights the fire. Your premises is heavily damaged by the fire. But none of the nearby businesses are physically damaged. As a result, we'll consider the period of time those businesses are closed due to your fire to be loss of use of tangible property of others that isn't physically damaged.*

*Id.*[4] St. Paul's motion focuses on both the "physical damage to tangible property of others" and the "loss of use" prongs of the definition. However, Atmel's opposition clarifies that it is only contending that there is coverage under the "loss of use" prong.

**C. The CGL Policies Do Not Cover the *Seagate* Settlement**

As an preliminary matter, the Court rejects Atmel's contention that St. Paul's refusal to defend the *Seagate* action precludes St. Paul from challenging coverage. Courts have repeatedly held that even if it is determined that an insurer breached its duty to defend, the insured still bears the burden of

---

[4] The umbrella excess liability protection coverage only applies to the CGL coverage and does not provide coverage for any errors and omissions exposure. The excess coverage provides coverage for bodily injury and property damage liability, personal injury liability, and advertising injury liability. The coverages provided in the excess coverage do not differ from those of the CGL coverage in any significant respect. *See* Goodman Decl. ¶ 23, Tab V (Ex. 22 at ABD0005254).

proving coverage. *See Pruyn v. Agricultural Ins. Co.*, 36 Cal. App. 4th 500, 514 (1995). In *Everett Associates v. Transcontinental Insurance Company*, 159 F. Supp. 2d 1196 (N.D. Cal. 2001), the court rejected a similar argument:

> When a settlement of the underlying claim has been made, the question of whether the liability of the insured was one which the contract of insurance covered is still open and may be litigated and determined in the action brought by the insured to recover the amount so paid in judgment. The settlement becomes presumptive evidence only of the liability of the insured and the amount thereof. . . .
>
> When the issues upon which coverage depends are not raised or necessarily adjudicated in the underlying action, then the insurer is free to litigate those issues in the subsequent action and present any defenses not inconsistent with the judgment against its insured. Thus, the insurer may litigate whether the policy covered the liability underlying the settlement in the subsequent action, and damages paid pursuant to a settlement are recoverable if the insurance policy covered such damages.

*Id.* at 1209 (internal citations and quotations omitted). Here, the question of whether Seagate's alleged damages constituted "loss of use" damages is an open one, and St. Paul is free to litigate that issue in the instant case.[5]

Turning to the substance of the parties' arguments, St. Paul contends that none of the damages claimed by Seagate were for "loss of use" because Seagate did not seek to place a value on any harm that might have been sustained from the inability to use drives that quit working after their Atmel chip failed. Instead, St. Paul argues, Seagate's claimed damages related solely to the cost of repairing the drives, i.e., removing and replacing the Atmel chips or replacing the drives, and costs associated with accomplishing these tasks. In response, Atmel asserts that since Seagate's customers lost the use of disk drives because of failures of Atmel chips, all of the damages Seagate claimed were damages flowing from its customers' lost use of the drives.

The Court concludes that the damages sought by Seagate at the time of the settlement were not "loss of use" damages, and thus that there is no coverage under the CGL policies for the *Seagate*

---

[5] Moreover, the Court notes that Atmel has not supplemented the record with any evidence regarding the nature of Seagate's damages, and indeed, Atmel contends that the record in the *Seagate* action supports a finding that Seagate's damages were for "loss of use."

6

settlement.[6] Although none of the cases cited by the parties squarely address the specific types of damages alleged by Seagate, the cases and treatises strongly suggest that those damages are not "loss of use" damages. *See F & H Construction v. ITT Hartford Insurance Company of the Midwest*, 118 Cal. App. 4th 364 (2004) (damage claim for "loss of use" must be based on lost rental value or its equivalent; costs of modifying and repairing defective caps and for loss of early completion bonus not "loss of use" damages); *Hendrickson v. Zurich American Ins. Co.*, 71 Cal. App. 4th 1084, 1091 (1999) (farmers who alleged loss of profits and diminution of property value because of inability to use fields to grow strawberry crops alleged "loss of use" damages triggering duty to defend); *Collin v. American Empire Ins. Co.*, 21 Cal. App. 4th 787, 818 (1994) (damages for conversion and damage to real property not "loss of use" damages; trial court improperly conflated damages due to loss of use of property and loss of property); *see also American Motorists Ins. Co. v. Trane Co.*, 544 F. Supp. 669, 683 (W.D. Wis. 1982) (under Wisconsin law, diminished value as a result of diminished production capacity constituted "loss of use" damages); *see also* 23 Cal. Jur. 3d § 70 (stating loss of use of personal property may be determined by rental value of similar property or loss of profits); *id.* at § 73 (stating loss of use of real property may be determined by rental value, lost profits, and/or increased costs resulting from loss of use).

Here, Seagate expressly stated that it was not seeking damages related to lost profits or lost sales. *See* Goodman Decl. Tab. L at AC12352. In addition, none of the damages sought by Seagate can be characterized as extra costs incurred as a result of the loss of use of the drives. Instead, as Atmel acknowledges, Seagate's damages primarily consisted of costs associated with repairing and replacing the Atmel chips. Although Atmel is correct that these damages would not have been incurred but for the failure of the Amtel chips, that does not compel a finding that these damages are "loss of use" damages. Atmel's expansive definition of "loss of use" damages includes any and all damages related to the failure of the Atmel chips in the Seagate drives, and does not require a nexus with Seagate's (or its customers') inability to *use* the drives. The Court does not hold, as urged by St. Paul, that loss of use

---

[6] This order is limited to the sole issue presented by St. Paul's motion for partial summary judgment – coverage for the *Seagate* settlement under the CGL policies – and accordingly does not address the separate question of whether St. Paul had a duty to defend Atmel under those policies.

7

damages can *only* consist of rental value or its equivalent. However, the Court holds that the damages alleged by Seagate at the time of the settlement were too attenuated from a "loss of use," and there must be a more direct connection between the damages claimed and the loss of use of the property in order to establish coverage under the CGL policies.[7]

*Anthem Electronics, Inc. v. Pacific Employers Insurance Company*, 302 F.3d 1049 (9th Cir. 2002), relied on extensively by Atmel, is distinguishable. In *Anthem*, the plaintiff insured supplied circuit boards to a manufacturer, KLA, and KLA incorporated the circuit boards into scanners that KLA sold. The circuit boards had latent defects that caused some of the scanners to fail once in use. Because some of the scanners in use by KLA's customers failed, KLA was forced to replace them and to incur "other unexpected costs due to the loss of use of the scanners into which Anthem's circuit boards had been installed." *Id.* at 1052. KLA sued Anthem, and in an answer to interrogatories, KLA categorized its damages claims as including, among other expenses, the following:

- Approximately $2.2 million in depreciation expenses for "loaner" scanners placed at 14 customer sites while defective KLA scanners were under repair
- Approximately $0.5 million in interest expenses (inventory cost) for scanners rendered unshippable by the defective Anthem components
- Approximately $0.7 million in lost interest revenue as a result of customers' failures to pay bills on time because of defective scanners

*Id.* at 1052. Anthem tendered KLA's suit to its two general liability coverage insurers. Both insurers refused to defend on the ground that the losses alleged in KLA's complaint were not covered under the CGL policies. Both CGL policies provided that the insurers would pay damages because of "property damage," which in turn was defined as "[p]hysical injury to tangible property, including . . . loss of use of tangible property that is not physically injured." *Id.* at 1053.

The Ninth Circuit held that the insurers had a duty to defend Anthem because "the KLA complaint was sufficient to raise the possibility that KLA suffered a loss of use of the systems into which Anthems circuit boards had been installed." *Id.* at 1058. Here, the question is not whether the *Seagate* complaint raised the possibility of coverage under the CGL policies – a question not addressed

---

[7] Because the Court concludes that at the time of settlement Seagate was not seeking damages for "loss of use," the Court need not address the parties' arguments regarding the "impaired property" exclusion.

8

by this order – but rather whether the factual record and claims at the time of the *Seagate* settlement demonstrates coverage. *Anthem* is further distinguishable because in that case the insured actually alleged damages suffered as a result of the loss of use of scanners in the form of the cost of providing loaner scanners and lost receivables. *Id.* at 1057 ("KLA's customers lost the use of tangible property (their scanners), and as a result KLA suffered losses due to loaner scanners and diminished receivables. KLA itself lost the use of unshippable scanners sitting in inventory, and as a result incurred unexpected inventory costs.").

Atmel also suggests that even if the *Seagate* settlement is not covered under the CGL policies, St. Paul is nevertheless liable for the settlement to the extent that Atmel paid it to mitigate future defense costs. None of the cases cited by Atmel support this argument, and indeed the *Everett* court rejected this contention. *See Everett*, 159 F. Supp. 2d at 1211.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS St. Paul's motion for partial summary judgment re: CGL and umbrella policies. (Docket No. 332).

**IT IS SO ORDERED.**

Dated: April 17, 2006

SUSAN ILLSTON
United States District Judge